UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CRIMINAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ERIC SILVERMAN,

Defendants.

_______________________________/

CASE NO. 00-6168-CR-FERGUSON

**OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT**

Defendant, ERIC SILVERMAN, by and through undersigned counsel, respectfully notifies this Honorable Court of his objections to the pre-sentence investigation report, including corrections, additions and deletions, and in support thereof would show:

(The facts outlined within this reply may be used in conjunction with the motion for downward departure at the time of sentencing.)

OFFENSE CONDUCT:

1. Page 5,Paragraph 9. Defendant Silverman ceased participation in November 1998, not September 1999. Defendant Silverman, through counsel, had been in contact with the HUD civil division investigators (CPA

TED CRESPI, P.A. • PRUDENTIAL PLAZA • 1776 NORTH PINE ISLAND ROAD • SUITE 218 • PLANTATION, FLORIDA 33322

Nixon) regarding the civil investigation that ultimately led to the criminal investigation and this indictment. Defendant Silverman closed all property deals that were pending by November 1998 and did not continue participation thereafter. (This was immediately after Mr. Nixon's meeting, instructions and advice.)

2. The pre-sentence investigation report, Page 7, Paragraph 22, accurately reports that Cohen formulated the entire scheme. Silverman never participated in a HUD/FHA insured mortgage loan until he met Mark Cohen. Mark Cohen, who was previously convicted of related activities, *introduced Silverman to HUD loan financing. Cohen was instrumental in* teaching Silverman what was first believed to be legal transactions. It was Cohen, not Silverman, who made arrangements for falsified payroll documents, pay stubs, loan processors and negotiators. It was Cohen who drafted all of the contracts between the buyers and sellers, and who selected the attorneys to complete the transactions.

3. According to records produced in discovery, Cohen bought and sold approximately fifteen (15) properties before he met Silverman. The allegation that Silverman "developed" this scheme is an incorrect statement.

4. Within Paragraph 22, it has also been alleged that homes were

purchased and resold at "greatly inflated prices." All of the properties were appraised by a certified appraiser, who has not been accused of any wrongdoing at all. There is no evidence to support that the appraisals were inaccurate. You can rest assured that the Government would have indicted the appraiser(s), had they had evidence to believe that the properties were not accurately appraised. The properties were purchased at or near low value, and were resold at a profit. The HUD underwriters would not have approved or signed off on the loans if there was any evidence of impropriety in the appraisal of the properties. The properties were fairly appraised.

5. It is important to note that it was Cohen, not Silverman, who prepared the false and fictitious documentation establishing the borrowers' ability to pay. While Silverman had knowledge of these actions, it was Cohen who handled these matters exclusively. Silverman should not be labeled with Cohen as a developer and/or organizer. The four (4) point assessment should be deleted or reduced.

6. Page 5, Paragraph 10. Mark Cohen, not Silverman, completed the purchase and sales contracts. All of the contracts are in Mark Cohen's handwriting, which can be confirmed by the Government agents. The brokers were associated with Mark Cohen and dealt with Cohen, not

Silverman. Cohen was responsible for the appraisers, realtors and buyers.

7. Page 5, Paragraph 11. Many of the borrowers were first time homeowners. The allegations that they were "uneducated and/or recent immigrants" leads to an unfair inference that they were taken advantage of. Noticeably absent is the fact that the great majority of these people are still living in these homes, paying their mortgages, and enjoying the privileges of home ownership, which would not have been possible, but for the advancing of gift funds, which Silverman was responsible for. It is interesting to note that at the present time gift funds may come from sellers under certain circumstances.

8. Silverman concedes that some of the monthly payments have risen. Many of the loans were funded via variable interest rates. They have changed somewhat over the past four (4) years. Other changes included rising property taxes, insurance premiums and assessments. It is an unfair statement to allege that the increase in monthly payments is drastically due to Silverman's actions.

9. There are allegations within Page 5, Paragraph 11 that "many of the mortgages" have gone into foreclosure or are in trouble. What is noticeably absent is the number of loans that have allegedly gone into

foreclosure. Later in the pre-sentence investigation report, it is alleged that eight (8) loans (of one hundred twenty-five (125)) went into foreclosure. Also noticeably absent is the definition of what determines when a loan is "in trouble." How does that percentage compare to the foreclosure rate in South Florida for similar HUD loans? The failure rate is slightly in excess of five (5%) percent of the total loans transacted in this case.

10. There are allegations in Paragraph 11 that many of the victims have lost everything they have put into these homes, without any indication who they are, the amount of their respective losses or whether other factors entered into lives, such as the economy, relocation, deportation, depreciation by neglect, domestic problems, etc. These problems affect all cross-sections of our society. No comparison has been made as to how the loan failure rate compares to other South Florida HUD loans. The use of adjectives and adverbs embellish the facts and losses unfairly.

11. Page 6, Paragraph 13. Defendant Silverman never signed purchase/sales contracts. This has been confirmed through handwriting analysis. Mark Cohen signed Silverman's name. Silverman had nothing to do with the negotiations with the sellers.

12. It is error to allege that the borrowers paid on average Fifteen

Thousand ($15,000.00) Dollars more for homes purchased the same day. The gross difference does not take into account the expenses associated with the transactions, which in most instances left small profit margins. The net profits are identified in the right margin of attached Exhibit "A." Some of the costs included home repairs, gift funds, inspection reports, appraisal fees and HUD mandatory insurance coverage in each and every transaction. The cost of HUD insurance amounts to over One Hundred Eighty-Eight Thousand ($188,000.00) Dollars on these transactions. The Court will note that the net profits following the sale range between One Thousand Six Hundred ($1,600.00) Dollars and Two Thousand Four Hundred ($2,400.00) Dollars, with a few exceptions higher and lower. It is important to note that at least four (4) of the transactions were not HUD transactions at all.

13. Silverman did not prepare false gift donor letters. The letters were prepared by Cohen. Silverman provided the gift funds.

14. Page 7, Paragraph 20. The loss is nowhere close to $1.8 million. The word "loss" is not defined correctly. The Government is guesstimating the total amount of money loaned. There are no credit or set-offs for existing loans, refinanced loans, payments, insurance premiums,

foreclosure sales proceeds, etc. This is in opposition to the loss calculation application notes. See 2F(8)(b). The Defendant is also being held responsible for negligence on the part of HUD in the foreclosure process. There is no evidence before this Court regarding the amount of the true "net loss" to HUD. There is no documentation for adjustments or recovery amounts. A mere "guesstimate" is not sufficient. See 2F(8).

15. The total amount of the gross loss amount attributable to Silverman was stipulated not to exceed $1.3 million, not $1.8 million.

16. Page 7, Paragraph 21. The determination of loss is, again, a guesstimate. If the Government is going to "average," then credits and set-offs need to be deducted to arrive at HUD's net loss. If eight (8) loans have gone into foreclosure and those properties have been sold, the loss is the difference between the original foreclosed loan amount and the auction or sales price less expenses. A Fifty Thousand ($50,000.00) Dollar loss on a single HUD foreclosure sale is unconscionable, but it happened in this case.

ROLE ASSESSMENT:

17. Page 7/8, Paragraph 22. It is properly acknowledged by the Government that Mark Cohen was the organizer of the entire scheme,

recruiting Silverman into the conspiracy. It is here that the Government alleges that eight (8) homes of the one hundred twenty-five (125) have gone into foreclosure, resulting in a foreclosure rate just over five (5%) percent. According to the information in Paragraph 22, HUD has lost Two Hundred Sixty-Five Thousand Eight Hundred Ninety-Six and 98/100 ($265,896.98) Dollars from properties that have gone into foreclosure (including the single $50,000 loss!). None of the supporting documents have been provided.

18. Page 8, Paragraph 23. Silverman's involvement ended in November of 1998, which is a correction from Page 5, Paragraph 9. Silverman's role in assisting the buyers was limited to providing a letter of alternate credit and providing gift funds. Mark Cohen was responsible for the rest.

19. Silverman takes exception to most of the allegations within this paragraph. Most of the information in this paragraph was gathered after Silverman began cooperating with the Government. This information was not to be utilized to punish him directly. Silverman has logged over seventy (70) hours of substantial assistance with the agents and the United States Attorney . In Paragraph 23, the Government has used some of the information supplied by Silverman to recommend a four (4) level

enhancement as an "organizer" under 3B1.1(a). Silverman should not receive a four (4) level increase under 3B1.1(a). Silverman's role was significantly less than Cohen's, as is confirmed throughout the pre-sentence investigation report. The last sentence of Paragraph 23, alleging that Silverman and Cohen were equally culpable in organizing and supervising is an erroneous allegation.

20. To establish equal culpability, the participants should have the same or similar responsibilities and actions. The Court is referred to Page 5, wherein the Government has alleged that Cohen was a mortgage broker, prepared fictitious documentation, hired and/or solicited the help of thirteen (13) individuals or entities essential to the transaction, applied for secured funding, falsified wage information, arranged for real estate viewing, negotiated and contacted properties, arranged for legal services, had fictitious documents created, and directed all of the operation. Silverman is not alleged to have engaged in any of this conduct and should not be held to the same level of culpability.

21. Page 9, Paragraph 26. Jean Lindor was not referring buyers to Silverman. Jean Lindor's buyers were referred directly to Cohen. Lindor was paid a commission by Cohen.

22. Page 10, Paragraph 30. Lee Garber was hired and fired by Cohen, not by Silverman. Cohen was responsible for overseeing the actions of Garber, not Silverman.

VICTIM IMPACT:

23. Page 10, Paragraph 34. The restitution amount of Two Hundred Sixty-Five Thousand Eight Hundred Ninety-Six and 92/100 ($265,896.92) Dollars has not been established with the documentation provided to the Defendant or to Probation. HUD came up with this amount without documenting how these losses were arrived at. That is fatal to the request for restitution. As noted earlier, one property alone sustained an alleged loss of over Fifty Thousand ($50,000.00) Dollars, following a HUD sale, a loss amount which is unconscionable, if done correctly. HUD should not be compensated for its negligence in the foreclosure process. HUD should be required to act in good faith to mitigate damages and losses, not to compound them.

ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY:

24. Page 11, Paragraph 30. The Defendant has provided a letter to

this Honorable Court accepting responsibility for his actions. The Defendant has cooperated since the inception of the investigation, beginning with HUD's CPA Nixon, HUD criminal investigators, FBI investigators, and the United States Attorney's Office. His acceptance of responsibility began more than one (1) year before the indictment was drafted. The Defendant should receive either a two (2) or three (3) level adjustment for his acceptance of responsibility, depending upon the offense level computation.

OFFENSE LEVEL COMPUTATION:

25. Page 11, Paragraph 37. The offense level computations depend upon the Court's interpretation of the total loss computations. It is agreed that 2F1.1 is the proper guideline section to apply for the offense.

BASE LEVEL OFFENSE:

26. Page 11, Paragraph 38 is agreed to.

SPECIFIC OFFENSE CHARACTERISTICS:

27. Page 11, Paragraph 39. Specific offense characteristics are highly disputed. The Defendant has moved for a continuance twice prior to

sentencing because of his inability to complete the proper loss calculations, as the amounts alleged by the Government are guesstimates and are illegal and inconsistent with one another. Respectfully, the Defendant will request this Honorable Court for the third time to continue the sentencing on this critically important issue.

28. The Defendant strenuously opposes the allegations of the loss falling between $1.5 million to $2.5 million, which results in a twelve (12) offense level increase. The Government and the Defendant have agreed that Silverman's worst scenario would limit his accountability to no more than $1,323,500.00. That amount is based upon the total "mark-ups" in property value upon sale. If the Court finds that the "property mark-ups" are the proper measure of loss, then the offense level increase is eleven (11), not twelve (12).

29. The Defendant's position is that the worst loss calculation would be limited to the actual sustained HUD losses in the amount of Two Hundred Sixty-Five Thousand Eight Hundred Ninety-Seven ($265,897.00) Dollars. Pursuant to Section 2F1.1(b)(1)(I), that would result in an eight (8) level increase. As previously argued, the absence of documentation to support HUD's actual loss on these properties and the inability to determine

mitigation and compliance with foreclosure procedures, the Defendant cannot agree to any amount alleged. The Court must require the Government to provide convincing evidence of the true net loss amount to HUD.

30. Page 11, Paragraph 40. The Government seeks a two (2) level increase as a result of a scheme to defraud more than one (1) victim, or a scheme involving more than minimal planning. The only identified victim is HUD. The only "victimized party" alleged in this conspiracy is HUD. The one Defendant engaged in more than minimal planning in furtherance of the scheme to defraud would be Mark Cohen. Silverman should not be assessed the additional two (2) level adjustment.

ADJUSTMENT FOR ROLE IN OFFENSE:

31. Page 12, Paragraph 42, Increased by Four (4) Levels. The Defendant incorporates his earlier argument denying the allegations that he was an organizer or a leader of criminal activity involving five (5) or more participants. The only person that would be subject to that type of adjustment would be Mark Cohen (It is assumed that the Subsection listed

by the probation officer, 3B1.2(a), was intended to be 3B1.1(a)(aggravation). Section 3B1.2(a) allows for up to a four (4) level decrease for a mitigating role.) If the Court finds that Silverman was a "supervisor," then an increase of no more than two (2) levels would be called for under 3B1.1(c).

32. Adjustment for Role - Should be Decreased by Two (2) Levels. The Defendant is eligible for a two (2) level decrease for his mitigating role. When comparing his actions to Cohen and other participants, minor participation is applicable and should result in a two (2) level decrease. The Court should take into account that Silverman came into this conspiracy after fifteen (15) properties had been purchased by Cohen, and Silverman withdrew from the scheme in November 1998, prior to completion of this scheme. Silverman was far less culpable than Cohen. The use of Silverman's corporation, ARC, resulted only because Cohen did not have credit, nor did Cohen have the ability to engage in certain transactions, which were unknown to Silverman at that time. Silverman was responsible for providing gift funds to facilitate the loans. The gift funds allowed people to purchase homes who may not have had that opportunity otherwise. Silverman never pressured any of these individuals, nor did he ever request or solicit the return of any of the gift funds. The gift funds decreased the

overall loan amount, and also apply as a set-off against the total loss. A two (2) level decrease for mitigating role is in order under 3B1.2.

33. Page 12, Paragraph 44. The adjusted offense level should be twelve (12). This is based upon the following:

| | |
|---|---|
| Base Offense Level: | 6 |
| Specific offense characteristic loss amount more than $200,000, less than $350,000, | 8 |
| Adjustment for role in the offense, minimal participant | -2 |
| Victim related adjustments | 0 |
| Adjustment for obstruction of justice | 0 |
| Adjustment for scheme to defraud more than one victim | 0 |
| Total | 12 |

ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY:

34. Page 12, Section 45. The Defendant will receive a two (2) level decrease for acceptance of responsibility under 3E1.1(a), assuming the Court accepts that the base level is below sixteen (16). If the offense level is found to be in excess of sixteen (16), then Silverman is entitled to a three

(3) level reduction. This should result in a total adjusted offense level of ten (10).

35. Page 13, Paragraph 56. Silverman's mother, Carmen Silverman, is a licensed medical doctor, but she is not practicing. Bernard Silverman also suffers from cancer and has suffered a stroke.

36. Page 14, Paragraph 59. In addition to the charity work with Pet Rescue, Silverman also performs charity work for Paws 4 Help, providing similar care for sick, injured or stray animals.

37. Page 15, Paragraph 66. Silverman holds a master's degree in hotel and restaurant management.

38. Page 16, Paragraph 71. Federal employer identification number for the business was 65-0721658.

39. Page 18, Paragraph 79. The Defendant no longer owns the 1990 Porsche 911C4 coupe. The car was repossessed.

PART D SENTENCING OPTIONS:

40. Page 21, Paragraph 91, Guideline Provisions. Based upon a total adjusted offense level of ten (10), and a criminal history category of zero (0), the Defendant falls within Zone B of the sentencing table. If the

Court finds that the offense level is twelve (12), then the Defendant falls within Zone C. If the Court accepts the Government's offense level, less the corrected agreed upon adjustments for the amount of loss and acknowledgment of responsibility, the base level would be twenty (20) (Zone D), with a recommended guideline sentence of thirty-three (33) to forty-one (41) months imprisonment.

GENERAL INFORMATION:

41. Since Mr. Silverman's first meeting with HUD CPA Nixon, through his meetings with HUD investigators, FBI agents, the Assistant United States Attorney, one fact has remained consistent, it was not Silverman's intent to hurt anyone. Many of the buyers shared hugs, kisses and handshakes with Silverman because of the thrill of owning their first home. Silverman did not realize the magnitude of the potential consequences involved. Many families were given the opportunity of a lifetime to own a home that they otherwise would not have. The Defendant was in his twenties, had never committed a crime, and from the outward appearance believed that everyone was benefitting from these deals. The majority of these people are still living in their homes and meeting their

obligations. This is an issue for the Court to consider in determining whether the punishment fits the crime. This is one of the few sections in the guidelines that suggests departures may be in order when the crime and punishment are disproportionate.

SENTENCING OPTIONS:

CUSTODY, SUPERVISED RELEASE, PROBATION, FINES, RESTITUTION.

41. Page 21 through 23, Paragraphs 90 through 102. The decisions made by this Honorable Court regarding the payment of loss is the determining factor of the options available to the Court. If the Court accepts the Defendant's position, the Defendant will fall within Categories B or C of the sentencing guidelines. This will allow this Honorable Court to place the Defendant on probation, and could incorporate a period of intermittent confinement, community confinement, and/or home detention. If the Court accepts the Government's position, and adjusts the sentence by the stipulated adjustments, then the Defendant would fall within Section D, subject to the departure options presented to the Court. The Defendant agrees with the conclusions reached by the probation officer on these provisions, but disagrees with the total offense level, suggesting that the

level should fall between ten (10) and twelve (12), rather than 20-21.

FACTORS THAT MAY WARRANT DEPARTURE:

42. Page 23, Paragraph 103. The Defendant is entitled to departure, based upon his cooperation and other factors. This is set forth in the motion for downward departure, which is adopted by reference and filed simultaneously with these objections.

IMPACT OF PLEA AGREEMENT:

43. Page 23, Paragraph 104. The plea agreement does impact the sentence. The Government will recommend the low end of the guidelines, absent any recommendation for departure for substantial assistance.

OTHER RELEVANT FACTORS:

44. Alternatives available to this Honorable Court include Federal Boot Camp incarcerative program. This is a suggestion of last resort because of Silverman's obligations to his immediate family, and due to the extent of cooperation he has provided.

**WHEREFORE, Defendant, ERIC SILVERMAN**, respectfully moves this Honorable Court to sustain the objections and correct the guidelines accordingly.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was faxed and hand delivered this 16 day of November, 2000, to JEFFREY KAPLAN, ASSISTANT U.S. ATTORNEY, U.S. Attorney's Office, 299 East Broward Boulevard, Fort Lauderdale, Florida 33301 (954-356-7336); and ORLANDO BURGOS, Probation Officer, 300 Northeast 1st Avenue, Suite 315, Miami, Florida 33132 (305-523-5496.

TED CRESPI, P.A.
Attorney for Defendant
Prudential Plaza, Suite 218
1776 North Pine Island Road
Plantation, Florida 33322
Telephone: (954) 475-7111
Facsimile: (954) 475-7211

BY: ______________________
TED CRESPI, ESQUIRE
Florida Bar No. 437689

SILVERMAN M/I

EXHIBIT "A"

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LEE, DAVID | EGS | REP | Security | 1/28/97 | ~~24,500~~ 18665 | 46547.07 | -170.93 | 1273 | 3042.97 | 42402.03 | 42402.03 | 1766.45 |
| WILSON, CHRISTOPHER | EGS | REP | Security | 1/29/97 | 16,500 | 32175.65 | 2944.18 | 7949.22 | 813.4 | 20468.85 | 20468.85 | 2000.00 |
| MENDOZA, FLOR | EGS | REP | Security | 2/20/97 | 11,000 | | | | | | 15000 | 1614.78 |
| WOLSKE,JOYCE | EGS | PAMI | Sun Title | 3/5/97 | 10,000 | | | | | | 15000 | 1418.65 |
| LEVERETT, MELISSA | ARC | PAMI | Security | 3/7/97 | 11,000 | | | | | | 15000 | 1635.75 |
| BORREGO, OLGA | EGS | PAMI | Security | 3/7/97 | 11,500 | | | | | | 15000 | 2073.50 |
| FLORES, GONZALO | EGS | PAMI | Security | 3/12/97 | 13,500 | | | | | | 15000 | 2047.50 |
| JOHNSON,RACHEL | ARC | PAMI | Security | 3/19/97 | 13,100 | | | | | | 15000 | 2255.63 |
| SCHOOLCRAFT, CHERYL | EGS | PAMI | Security | 3/20/97 | 12,000 | | | | | | 15000 | 2111.40 |
| BARRETT,CLANSIE | EGS | PAMI | Certified | 3/24/97 | 11,500 | | | | | | 15000 | 1714.50 |
| ROQUES,SIXTA | ARC | PAMI | Security | 3/28/97 | 12,000 | | | | | | 15000 | 1732.50 |
| KNIGHT, NATALENE | ARC | PAMI | Certified | 4/3/97 | 12,000 | 36628.71 | 105.62 | 2218.16 | 5776.95 | 28527.98 | 28527.98 | 1869.00 |
| JEROME, EDDY | ARC | PAMI | Security | 4/10/97 | 14,000 | 21547.76 | 1041.41 | 1740.85 | 6186.12 | 12579.38 | 12579.38 | 2470.50 |
| GRISALES, YOHN A. | ARC | PAMI | Security | 4/24/97 | 11,500 | | | | | | 15000 | 1737.00 |
| PATINO, HECTOR G | ARC | PAMI | Security | 4/28/97 | 11,500 | | | | | | 15000 | 1792.13 |

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | m/I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MATOS, SANDRA G. | ARC | PAMI | Security | 4/30/97 | 12,500 | 17096.06 | 697.89 | 2909.35 | 10275.82 | 3213 | 3213 | 2155.55 |
| HEBBERT, MARIA L | ARC | PAMI | Security | 5/3/97 | 14,000 | | | | | | 15000 | 2,506.50 |
| ORELUS, EMMANUEL | ARC | PAMI | Security | 5/12/97 | 11,600 | | | | | | 15000 | 2513.63 |
| BETYE, LUMINITZA M. | ARC | PAMI | Automated | 5/21/97 | 14,000 | | | | | | 15000 | 2527.88 |
| NIELLY, SHARONDA | ARC | PAMI | Certified | 5/21/97 | 17,500 | | | | | | 15000 | 2041.88 |
| GARREPY, NITZA | ARC | PAMI | Automated | 6/6/97 | 12,000 | | | | | | 15000 | NOT HUD |
| ORTIZ, LUZ | ARC | PAMI | Automated | 6/8/97 | 12,000 | | | | | | 15000 | 1847.25 |
| JOHNSON, LEROY (VA) | ARC | PAMI | Automated | 6/9/97 | 8,000 | | | | | | 15000 | NOT HUD |
| DEVALON, JOEL | ARC | PAMI | Automated | 6/20/97 | 13,000 | | | | | | 15000 | 1741.50 |
| MAZARD, MARIE | ARC | PAMI | Automated | 6/25/97 | ~~12,000~~ 12,000 | | | | | | 15000 | 1963.11 |
| DIMANCHE, JEAN CLAUDE | ARC | PAMI | Automated | 6/26/97 | 10,000 | | | | | | 15000 | 1737.00 |
| GRAY, KENNETH | ARC | PAMI | Automated | 6/28/97 | 12,000 | | | | | | 15000 | 2000.00 est |
| LITHERLAND, LENWORTH | ARC | PAMI | Automated | 7/11/97 | 12,000 | | | | | | 15000 | 1978.88 |
| PALMA, MEDARDO | ARC | PAMI | Automated | 7/18/97 | 12,500 | | | | | | 15000 | 1946.25 |
| PENA, ANIBAL | ARC | PAMI | Automated | 7/19/97 | 14,500 | | | | | | 15000 | 2543.63 |

NOT HUD X

NOT HUD X

2553331

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | M/I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABRE, JEAN | ARC | PAMI | Automated | 7/23/97 | 10,500 | | | | | | 15000 | 1902.38 |
| VAUGHN, MITCHELL C | ARC | PAMI | Automated | 7/24/97 | 15,200 | | | | | | 15000 | 2543.63 |
| THOMAS, WALLACE | ARC | PAMI | Automated | 8/11/97 | 15,000 | | | | | | 15000 | 1760.41 |
| GARCIA, STEVEN C. | ARC | PAMI | Automated | 8/14/97 | 12,500 | | | | | | 15000 | 2000.00 est |
| DENIS, GILBERT | ARC | PAMI | Automated | 8/25/97 | 12,000 | | | | | | 15000 | 1912.50 |
| RIVERA, VICTOR | ARC | PAMI | Automated | 8/25/97 | 14,000 | 52726.34 ? | -3734.18 | 1267.35 | 4659.72 | 50533.45 | 50533.45 | 2287.13 |
| BENOIT, KATHERINE | ARC | PAMI | Automated | 8/27/97 | 12,000 | | | | | | 15000 | 2000.00 est |
| GEORGES, ANIBAL | ARC | PAMI | Automated | 9/11/97 | 12,000 | | | | | | 15000 | 1803.38 |
| URUEJOMA, CAROLINE I | ARC | PAMI | Automated | 9/11/97 | 15,000 | | | | | | 15000 | 1868.65 |
| JACKSON, MICHELLE | ARC | PAMI | Automated | 9/19/97 | 12,500 | 21109.12 | 455.65 | 3592.53 | 4509.97 | 12550.97 | 12550.97 | 2,000.00 est |
| FRANCOIS, MARIE G | ARC | PAMI | Automated | 9/24/97 | 12,000 | | | | | | 15000 | 1626.75 |
| DOREUS, ROSALIE | ARC | PAMI | Automated | 9/29/97 | 15,000 | | | | | | 15000 | 1693.13 |
| JABOIN, RAPHAEL | ARC | PAMI | Automated | 10/6/97 | -0 | | | | | | ? 15000 | 1209.38 |
| RODRIGUEZ,EMERITA | ARC | PAMI | Automated | 10/16/97 | 13,000 | | | | | | 15000 | 1428.75 |
| SALTZ, JOHN | ARC | PAMI | Automated | 10/22/97 | 15,000 | | | | | | 15000 | 2410.88 |

22446.95

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | MI | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEROSIER,TITI | ARC | PAMI | Automated | 11/13/97 | 10,000 | | | | | | 15000 | 2011.50 | |
| MIKE, WILLIE MAE | ARC | PAMI | Automated | 11/19/97 | 18,500 | | | | | | 15000 | 2165.63 | |
| WILLIAMS, RUPERT N | ARC | PAMI | Automated | 11/19/97 | 14,000 | | | | | | 15000 | 2078.42 | |
| LINDOR, JOSCHEBA | ARC | PAMI | Automated | 11/20/97 | 16,500 | | | | | | 15000 | 2000.00 | est |
| CARSWELL, JANICE | ARC | PAMI | Automated | 11/24/97 | 13,000 | | | | | | 15000 | 1715.51 | |
| SOBALVARRO, JUAN J. | ARC | PAMI | Automated | 11/26/97 | 14,000 | | | | | | 15000 | 2045.41 | |
| ELLIS, MARSHA | ARC | PAMI | Automated | 12/8/97 | 13,100 | | | | | | 15000 | 2000.00 | est |
| TELFORT, GUY | ARC | PAMI | Automated | 12/12/97 | 12,000 | | | | | | 15000 | 2199.38 | |
| PRINCE, MARIE C. | ARC | PAMI | Automated | 12/18/97 | 15,600 | | | | | | 15000 | 2540.27 | |
| MOISE, LEGUET | ARC | PAMI | Automated | 12/19/97 | 13,500 | | | | | | 15000 | 2012.42 | |
| THOMAS, STEVE | ARC | PAMI | Security | 1/5/98 | 12,000 | | | | | | 15000 | 1759.50 | |
| DUCATEL, JOSEPH | ARC | PAMI | Automated | 1/7/98 | 9,000 | | | | | | 15000 | 1770.48 | |
| PINCKNEY, DAVID | ARC | PAMI | Automated | 1/7/98 | 17,000 | 38066.27 | 674.75 | 3036.75 | 2122.43 | 32232.34 | 32232.34 | 1957.45 | |
| LINDOR, JEAN | ARC | PAMI | Automated | 1/8/98 | 12,500 | | | | | | 15000 | 2000.00 | est |
| THOMAS, ASPINELL | ARC | PAMI | Automated | 1/20/98 | 12,500 | | | | | | 15000 | 2000.00 | est |

12255 95

M/I

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARANCIBIA, FERNANDO (Not HUD Arancibia) | BIV | OTAB | Title Express | 3/28/98 | 15,000 | | | | | | 15000 | X |
| LYTTLE, MERVINA, GOULBOURNE, LEROY | ARC | OTAB | Title Express | 3/30/98 | ~~12,500~~ 13,500 | | | | | | 15000 | 1759.50 |
| WILDET, FRANCOIS | ARC | OTAB | Title Express | 4/3/98 | 13,000 | | | | | | 15000 | 1912.52 |
| SILVERMAN, ERIC | BIV | LIBERTY | Title Express | 4/3/98 | 22,000 | | | | | | 15000 | 2243.25 |
| EUGENE, BLONDAISE (NOT HUD) | ARC | GoldCoast | Title Express | 4/8/98 | 11,000 | | | | | | NOT HUD 15000 | X (NOT HUD) |
| CHARLMONT, ANGELIQUE | ARC | OTAB | Title Express | 4/23/98 | 13,500 | | | | | | 15000 | 1968.43 |
| LERBY, WASHIAN PIERRE, GUERDA | ARC | GoldCoast | Title Express | 4/25/98 | 9,000 | | | | | | 15000 | 2067.41 |
| YNNELUS, MARADIEU JEAN, ROSANA | ARC | GoldCoast | Title Express | 4/26/98 | 13,500 | | | | | | 15000 | 1748.52 |
| JEAN PIERRE, RAPHAEL | ARC | GoldCoast | Rosenthal Rosenthal Rasco | 5/8/98 | 14,500 | | | | | | 15000 | 1990.44 |
| ROSEME, MISTEDEL SOSA, LILY | ARC | GoldCoast | Automated Title | 5/19/98 | 12,500 | | | | | | 15000 | 1814.49 |
| SARA, ARICILE | ARC | GoldCoast | Title Express | 5/21/98 | 11,000 | | | | | | 15000 | 2507.49 |
| ANTOINE, HARRY | ARC | GoldCoast | Title Express | 6/13/98 | 15,500 | | | | | | 15000 | 2408.31 |
| EDOUARD, FRANCOIS BLANCHARD, MARIE | ARC | OTAB | Title Express | 6/24/98 | 12,000 | | | | | | 15000 | 2045.25 |
| PIERRE-LOUIS, OLGA | ARC | GoldCoast | Title Express | 7/1/98 | 8,000 | | | | | | 15000 | 1493.[illegible] |
| GILLES, MARIE S JULES, GILBERT | ARC | OTAB | Title Express | 7/2/98 | 10,000 | | | | | | 15000 | 2089.19 |

26047.79

M/I

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS, LUDERS | ARC | OTAB | Title Express | 7/2/98 | 10,500 | | | | | | 15000 | 1935.45 |
| MADEUS, RESILIA BLANC, FRANK | ARC | GoldCoast | Title Express | 7/6/98 | 15,000 | | | | | | 15000 | 1870.47 |
| JOSEPH, JACQULIN (CONVENTIONAL) NOT HUD | ARC | GoldCoast | Title Express | 7/9/98 | 14,500 | | | | | | 15000 | NOT HUD |
| PIERRE, PETER | ARC | GoldCoast | Title Express | 7/29/98 | 6,000 | | | | | | 15000 | 2000.00 est |
| ETIENNE, CAROL | ARC | GoldCoast | Title Express | 8/1/98 | 16,000 | | | | | | 15000 | 2529.34 |
| FRANCOIS, ROCHEL ALCIN, THERESE | ARC | GoldCoast | Title Express | 8/1/98 | 17,000 | | | | | | 15000 | 2089.40 |
| LAROSE, GINA | ARC | GoldCoast | Title Express | 8/4/98 | 10,000 | | | | | | 15000 | 2000.00 est |
| PIERRE, MOSENIQUE DESAME, ANDRE | ARC | GoldCoast | Title Express | 8/19/98 | ~~16,000~~ 14,000 [illegible] | | | | | | 15000 | 2485.28 [illegible] |
| JEROME, WILLIO ST CYR, BRUNETTE | ARC | GoldCoast | Title Express | 8/25/98 | 13,500 | | | | | | 15000 | 2606.24 |
| SHAW, VIVEN | ARC | GoldCoast | Title Express | 8/26/98 | 10,000 | | | | | | 15000 | 1935.45 |
| TOWNSEND, JACQUELINE | ARC | GoldCoast | Title Express | 8/27/98 | 14,000 | | | | | | 15000 | 1584.36 |
| SANON, JEAN & VITANIE | ARC | CITRUS | Title Express | 9/19/98 | 16,100 | | | | | | 15000 | 2547.40 |
| ENGUITA, LAZARO | ARC | GoldCoast | Title Express | 9/22/98 | 13,000 | | | | | | 15000 | 2089.40 |
| GEFFRARD, PALICIA | ARC | GoldCoast | Title Express | 9/29/98 | 11,500 | | | | | | 15000 | 2397.13 |
| DUMERLUS, LOUIS RAYMOND, LEMEZE | ARC | CITRUS | Title Express | 10/10/98 | ~~14,000~~ 13,750 | | | | | | 15000 | 1929.90 |



m/I

| Borrower Name | Seller | Mortgage Company | Closing Agent | Closing Date | Markup | HUD Actual Loss | Taxes | Maint & Operation | Sales Expense | HUD Sale Loss | Final Calculation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LORMIL, MARIE | ARC | CITRUS | Title Express | 10/16/98 | 13,500 | | | | | | 15000 | 2606.27 |
| BLANC, MARIE L | ARC | CITRUS | Title Express | 10/20/98 | 13,300 | | | | | | 15000 | 1671.53 |
| CORVO, ERNESTO | ARC | CITRUS | Title Express | 10/31/98 | 12,500 | | | | | | 15000 | 1704.51 |
| CARRASCO, HECTOR | ARC | CITRUS | Title Express | 11/13/98 | 11,000 | | | | | | 15000 | 2086.60 |
| GERMAIN, BERTEAU CINEAS, YVROSE | ARC | CITRUS | Title Express | 11/20/98 | 7,000 | | | | | | 15000 | 2375.33 |
| CHERES, ILOURDES BORLEUS, BETHUEL | ARC | CITRUS | Title Express | 11/21/98 | 14,000 | | | | | | 15000 | 1781.48 |
| SWABY, GLENVILLE LUCIUS, ROSALIE | ARC | CITRUS | Title Express | 11/22/98 | 16,000 | | | | | | 15000 | 2455.94 |
| MEZA, LILLIAN &ELMER | ARC | CITRUS | Title Express | 11/24/98 | 15,000 | | | | | | 15000 | 1062.00 |
| LEANDRE, JIMMY BAPTISTE, BERTIN | ARC | CITRUS | Title Express | 12/9/98 | 16,500 | | | | | | 15000 | 2000.00 ? est |
| PHILIP, ROSE B | BIV | CITRUS | Title Express | 12/22/98 | 15,000 | | | | | | 15000 | X |
| LARMARRE, LIONEL & ROSELINE | BIV | CITRUS | Title Express | 12/23/98 | 12,000 | | | | | | 15000 | X |
| GERMAIN, MARCIAL | BIV | CITRUS | Title Express | 12/30/98 | 14,500 | | | | | | 15000 | X |
| Totals | | | | | 1,328,500 | 265,897 | 2,014 | 23,987 | 37,387 | 202,508 | $1,612,608.00 | without expenses |
| | | | | | 1256,665 | | | | | | $1,675,896.98 | with expenses |

Not me (PHILIP) · Not me (LARMARRE) · Not me (GERMAIN, MARCIAL)

1675,896.98 − (188,264.29 MIP + 60,000 Not my deals) = $1,427,632.69 (all my deals at $15,000 including non-HUD) Paid to HUD in Mortgage insurance

My avg was = $12,823.11 a deal not $15,000 big diff. over 100 properties!

~~[illegible]~~ aprox: < $188,264.29

In Addition they calculated $75,000 markup Final on non HUD deals how did they arrive at this? Over